**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BISHOP & DIEHL, LTD (f/d/b/a BISHOP, DIEHL & LEE, LTD), an Illinois corporation | ) ) | |
| | ) | Case No. 1:25-cv-5395 |
| Plaintiff, | ) | |
| | ) | Judge: Hon. John F. Kness |
| v. | ) | |
| | ) | |
| NICHOLAS LEE, SUZIE, and | ) | JURY DEMANDED |
| ZHANG HENG (a/k/a HENRY RICH or WEISITE) | ) ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiff BISHOP & DIEHL, LTD. (the "Firm" or "Bishop Diehl"), through its undersigned

attorneys, and for its Second Amended Complaint against Defendants, NICHOLAS LEE, ZHANG

HENG (a/k/a HENRY RICH or WEISITE), and SUZIE LEE, states the following:

**NATURE OF THE CASE**

1. This action arises out of the unlawful conduct of attorney Nicholas Lee and his co-

conspirators while Lee was an equity partner with Bishop Diehl, including but not limited to

violating the Lanham Act, 15 U.S.C § 1125(a) and the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961, breaching fiduciary duties owed to the Firm,

conversion of Firm property and unlawful solicitation of the Firm's clients. While he was an

equity partner with the Firm, Lee instructed Firm clients to make nearly $400,000 in payments

directly into his personal bank account for legal work that Lee and others at the Firm had

performed. He also sent at least one client a fake invoice on Firm letterhead, instructing that client

to deposit $10,000 directly into his personal bank account. The Firm had no knowledge that Lee

was directing the Firm's clients to make payments for legal services performed by the Firm into his personal bank account instead of to the Firm.

2.  Lee's co-conspirators in this scheme were Zhang Heng (a/k/a Henry Rich or Weisite), a referral source who worked with Lee to defraud the Firm through a pattern of racketeering activity, and Lee's wife, Suzie Lee ("Suzie"), who was for a time employed as the Firm's bookkeeper and accountant. Acting in concert as an unlawful enterprise, they systematically misappropriated the Firm's revenue and work opportunities, misused firm resources, fabricated legal documents, and concealed their misconduct in furtherance of their self-enrichment, subjecting them to joint and several liability under the Lanham Act, 15 U.S.C § 1125(a), and RICO, 18 U.S.C. § 1961 *et seq*. Their scheme involved multiple predicate acts of wire fraud and theft, affecting interstate commerce over a substantial period.

3.  On January 24, 2025, Lee announced he was leaving the Firm, effective January 31, 2025, but he refused to identify the law firm he was joining. After Lee's subsequent termination for cause on January 27, 2025, the Firm discovered that he was joining Dickinson Wright, PLLC. Before Lee's employment was terminated, however, he solicited the Firm's clients, without the Firm's knowledge, to move their business to Dickinson Wright. As a result of Lee's unlawful solicitations, several clients left the Firm for Dickinson Wright, costing the Firm over $1 million in revenue.

### PARTIES, JURISDICTION AND VENUE

4.  Plaintiff Bishop Diehl is a law firm organized as an Illinois corporation and engaged in the practice of law in the State of Illinois. Bishop Diehl's principal place of business is currently at 1475 East Woodfield Road, Suite 800, Schaumburg, Illinois 60173.

5. Defendant Lee is an attorney licensed to practice law in the States of Illinois and Wisconsin, though he is currently suspended in Wisconsin. On information and belief, Lee is a resident of the State of Illinois and lives in Lake County, Illinois.

6. Defendant Zhang Heng or HR is a Chinese national residing or having a place of business at Room 102, Unit 4, Building 42, Xiangyi Four Seasons Flower City, Lianyungang Jiangsu, China, and who uses various aliases, including Henry Rich and Weisite.

7. Defendant Suzie is married to Defendant Nicholas Lee and, on information and belief, lives with Lee in Vernon Hills, Illinois. At relevant times, Suzie was employed as a bookkeeper and an accountant at the Firm.

8. At relevant times up to the afternoon of January 27, 2025, Lee was a partner of the Firm with an equity ownership interest of 20%. As such, while a partner, Lee owed the Firm and his partners a fiduciary duty, including a duty of care and a duty of loyalty.

9. The Firm brings claims against Lee and HR under the Lanham Act, 15 U.S.C § 1125(a), based on the unauthorized use of the Firm's name, branding, and letterhead in commerce.

10. The Firm also seeks relief against Lee, Suzie, and HR under the RICO statute, 18 U.S.C. § 1961 *et seq.*, and other applicable laws, for defrauding the Firm through a coordinated scheme and pattern of racketeering activity.

11. This Court has original jurisdiction over the Firm's Lanham Act claim pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121(a), the Firm's RICO claim pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the Firm's state law claims pursuant to 28 U.S.C § 1367, as those claims arise from the same nucleus of operative facts.

12. Venue is proper in this district under 28 U.S.C. § 1391(b) because Lee and Suzie reside in this District and because the events giving rise to the claims asserted in this complaint occurred in

3

this judicial district. Venue is proper as to HR under 28 U.S.C. § 1391(c)(3) as he is not a resident of the United States.

**FACTUAL BACKGROUND**

13. On March 15, 2013, Lee executed a Confidential Stockholder Agreement (the "Stockholder Agreement"), making him one of three equity partners of the Firm. (*See* redacted copy of Confidential Stockholder Agreement, attached as Exhibit A). Pursuant to the Stockholder Agreement, Lee owned 20% of the outstanding shares, another partner owned 20% of the outstanding shares and a third partner owned 60% of the shares.

14. As an equity partner, the Stockholder Agreement required all of Nicholas Lee's "activities in connection with the Practice of Law and all speaking, writing, publishing and teaching related to the Practice of Law" to be for the benefit of the Firm. (*See* Stockholder Agreement, attached as Exhibit A, p. 5, Art. IV(a)).

15. In addition, the Stockholder Agreement required that:

    a. Substantially all of Nicholas Lee's "business time and activities shall be in the Practice of Law for the benefit of the Firm." (Ex. A, p. 5, Art. IV(b));
    b. Lee will use his "best efforts for the benefit of the Firm and Firm clients." (Ex. A, p. 5, Art. IV(c));
    c. All income, fees and compensation received from clients shall be paid to the Firm. (Ex. A, p. 5, Art. IV(d)).

16. The Stockholder Agreement allowed Lee to engage in other activities for compensation that did not constitute the Practice of Law, provided those activities did not interfere with Lee's practice of law for the benefit of the Firm and Firm clients as set forth in the Stockholder Agreement. (Ex. A, p. 6, Art. IV).

17. Between 2013 and 2025, Lee and the Firm developed a practice in intellectual property law. In some cases, Lee acquired clients on his own and in other cases, Lee worked in tandem with other Firm partners to acquire clients.

4

**<u>Lee's Theft of Firm Property</u>**

18.     In 2014, Lee began working on matters for a Firm client referred to herein as NW, ranging from patent and trademark prosecution and hourly litigation work to contingent fee lawsuits.  At least as early as 2020, Lee began receiving regular monthly payments from NW in the amount of $5,000 per month for legal work Lee was performing for NW.  These payments were made via ACH or wire transfer directly into Lee's personal bank account.  Between February 2020 and January 2025, NW deposited $300,000 into Lee's personal bank account for legal work performed by Lee.

19.     The Firm had no knowledge that Lee was receiving monthly $5,000 payments from NW for legal work performed by Lee.  In fact, the Firm did not learn of NW's payments into Lee's personal bank account until February 2025, after Lee's termination from the Firm, when it discovered that Lee had directed a different client to wire a payment into his personal bank account.

20.     In addition to the payments from NW, Lee also directed HR to make payments for legal work Lee and others performed directly into Lee's personal bank account.[1]  HR referred clients from China to the Firm.

21.     In November 2023, HR asked Lee to provide legal services for clients whose products had been delisted by Amazon in response to patent infringement complaints.  HR and Lee had an arrangement where HR would prepare "patent non-infringement opinions" to get the products relisted, and those opinions would be sent to Amazon under Lee's signature associated with the Firm.

---

[1] The initial Complaint mistakenly referred to HR as a Firm client. He is more properly characterized as a referrer of the underlying clients.

22.    Lee instructed HR that "for actual signature purposes," to use Lee's signature block associated with the Firm as described below:

> Nicholas S. Lee, Esq.
> Registration No. 54,260
> Bishop Diehl & Lee, Ltd.
> 1475 E. Woodfield Road, Ste. 800
> Schaumburg, IL 60173
> (847) 925-9638

23.    In email exchanges with HR between November 15 and 23-29, 2023, and without the Firm's knowledge or authorization, Lee admitted that "[m]y firm wouldn't allow this… I would be doing this on a personal basis, which means payments would have to go directly to my personal account." (Emphasis added).  Lee directed HR to make payments for the patent non-infringement opinions into Lee's personal bank account, and HR made the payments accordingly.

24.    As a result of Lee's admission that the Firm would not allow Lee's conduct, HR knew that the patent non-infringement opinions he was distributing with the Firm's name, address and telephone number were not authorized or approved by the Firm.  Yet, HR went ahead and distributed the opinions anyway.

25.    In email exchanges with HR between December 11-13, 2023, and without the Firm's knowledge or authorization, Lee agreed to provide HR with trademark application services at a reduced rate of $150 per application, rather than the Firm's regular rate, and directed HR to deposit the fees for the work into Lee's personal bank account.  For expenses such as filing fees, however, Lee directed HR to reimburse the Firm.

26.    On May 29, 2024, and without the Firm's knowledge or authorization, Lee emailed an invoice prepared on the Firm's letterhead to HR, with instructions to deposit $10,000 into Lee's personal bank account for the Firm's preparation of a patent lawsuit on behalf of an underlying client.  The invoice Lee sent is inconsistent with the form of the invoices the Firm regularly

6

generates from its accounting software. On information and belief, Lee secretly prepared the invoice.

27. On September 26, 2024, and without the Firm's knowledge or authorization, Lee exchanged emails with HR regarding fees for a new matter in which Lee had entered an appearance. Lee directed HR to deposit $5,000 into his personal bank account.

28. On October 7-8, 2024, and without the Firm's knowledge or authorization, Lee exchanged several emails with HR regarding estimated costs for filing a default motion and a Temporary Restraining Order (TRO) in a recently filed patent litigation matter. Lee directed HR to deposit $5,000 into his personal bank account to get started on the work. That deposit was made on October 10, 2024.

29. On December 6, 2024, and without the Firm's knowledge or authorization, HR sent an email to Lee notifying him that he had deposited $5,000 into Nicholas Lee's personal bank account so Lee could have the Firm begin working on a new case. Lee responded on December 8, 2024, confirming receipt of the funds.

30. On December 14, 2024, and without the Firm's knowledge or authorization, HR again wired $10,000 into Lee's personal bank account for Lee to have the Firm proceed with a TRO and "a default." Lee instructed HR to cancel the transaction and instead wire the money to the Firm's bank account because, as Lee explained, "I need my associate to help me."

31. On January 15, 2025, and without the Firm's knowledge or authorization, HR wired $3,000 into Lee's personal bank account as payment for sending Amazon a letter.

32. In all, HR deposited more than $90,000 into Lee's personal bank account for legal work Lee and the Firm provided to HR or HR's clients.

33.     To date, and on information and belief, Lee has received at least $390,000 since 2020 for legal work from clients who were instructed by Lee to make payments directly into Lee's personal bank account. Those payments should have gone to the Firm.

34.     Moreover, Lee utilized his Firm email to communicate with these clients and Firm resources, including his professional time with the Firm and the professional time of other Firm employees, to perform the work.

35.     After Lee left for Dickinson Wright, the Firm discovered several emails from Lee to HR, directing HR to make payments into Lee's personal bank account, and confronted Lee about the transactions.

36.     In an email from Lee dated March 5, 2025, he tried to justify the payments the Firm's clients made into his personal account and disclosed, for the first time, that he had been working as the "general counsel" for NW and that his general counsel work for NW was the reason NW sent work to the Firm. However, Lee also insisted that his role as "general counsel" (which is literally the role of an attorney) did not involve any legal work for NW. In other words, although Lee claimed to be responsible for delegating NW's legal work to the Firm and other law firms, Lee also took the position that he was not providing legal services as NW's general counsel. Lee's explanation is false, disingenuous, and inconsistent with his own description of the work he performed for NW.

37.     Regardless of what Lee says now, the work he performed for NW and in association with HR, and the compensation for it, fell within the scope of Article IV(a)-(d) of the Stockholder Agreement, requiring all fees for Lee's work to be paid to the Firm, not Lee.

38.     In the same email from Lee dated March 5, 2025, and in another email from Lee dated February 17, 2025, he tried to justify the payments he received from HR by claiming (a) that

he was entitled to the money to "replenish" his retirement accounts and (b) part of what HR had sent was a gift. Not only did Lee admit that he took the Firm's money for himself without the Firm's permission, but none of Lee's communications with HR identified the payments as gifts.

39. In fact, Lee's communications with HR only confirm that the payments Lee received from HR were for legal work performed under the Firm's name (and malpractice insurance) and at the Firm's expense.

40. Lee's deceptive conduct here is underscored by (a) the fake invoice he sent to HR on firm letterhead, (b) the email he sent to HR, directing HR to cancel a wire transfer and pay the Firm instead for work performed by one of the Firm's associates instead of Lee, and (c) Lee's refusal to disclose the work or payments to the Firm.

41. Under Illinois law, when a fiduciary relationship exists, any transactions between the parties in which the agent alone profits – in this case Lee – are presumed to be fraudulent.

42. At all relevant times, Lee's wife, Suzie, worked for the Firm as its in-house bookkeeper and accountant, with access to Firm billing, receivables, and financial records.

43. On information and belief, Lee instructed or caused Suzie to suppress or omit billing entries from the Firm's financial records and/or to not create or send invoices for HR's clients to conceal Lee's diversion of client funds, thereby undermining the Firm's internal controls and further concealing the fraud. This concealment prevented other partners from detecting the work being done and the Firm's entitlement to payment. The Firm only discovered this omission after Lee's termination.

**False Designation of Origin Independently Initiated by HR**

44. In addition, HR, executed an "Amazon Patent Evaluation Express Agreement" in a patent dispute matter before "APEX," Amazon's express dispute resolution tribunal, which

9

identified HR as a seller's attorney and represented that the seller could be reached "**via counsel**: Weisite Law: Henry. 1475 E. Woodfield Road, Ste. 800 Schaumburg, IL," which is Bishop Diehl's address.  (*See* Amazon Patent Evaluation Statement, attached as Exhibit B) (emphasis added).

45.     HR is not associated with Bishop Diehl and did not have Bishop Diehl's authority to use the Firm's address in any manner.  Further, HR is not even admitted to practice law in any state in the United States.  HR's use of the Firm's address gave other attorneys in the same practice area the impression that HR was associated with the Firm, which is false.

46.     In January of 2024, counsel for the patent owner emailed Lee with the subject line "Stolen Reg Number."  In the email, counsel stated that "opposing counsel [HR] appears to be using your USPTO reg number, claiming association with your firm, and using your firm's address on submissions." (*See* redacted copy of invoice, attached as Exhibit C).

47.     Despite learning that another attorney suspected that HR was misappropriating the Firm's brand, name and address without the Firm's authorization or knowledge, Lee never disclosed to the Firm that HR had been doing these things or that another attorney had expressed concerns about HR's conduct.  Nor did Lee take any steps to prevent HR from misrepresenting his affiliation with the Firm.

### Lee's Unlawful Solicitation of Firm Clients

48.     In addition to his theft of the Firm's property, Lee unlawfully, and without the Firm's knowledge, solicited the Firm's clients to follow him to his new law firm, Dickinson Wright.

49.     Illinois law is well settled that "secretly attempting to lure firm clients (even those the partner has brought into the firm and personally represented) to the new association, lying to clients about their rights with respect to the choice of counsel, lying to partners about plans to

10

leave, and abandoning the firm on short notice (taking clients and files) would not be consistent with a partner's fiduciary duties [citations]." *See Dowd & Dowd Ltd v. Gleason*, 181 Ill.2d 460, 476-477 (1998) (citation omitted). Lee did all these things.

50. On Friday, January 24, 2025, Lee gave the Firm notice of his intention to leave the Firm, effective January 31, 2025. However, Lee refused to identify his new law firm or disclose that he was moving to Dickinson Wright.

51. Lee also gave notice of only seven days, despite the 60-day notice requirement in the Stockholder Agreement. (Ex. A, p. 6, Art. V). It soon became clear Lee intended to use the next seven days to secretly recruit the Firm's clients to Dickinson Wright.

52. Even before January 24, 2025, and through his termination for cause on January 27, 2025, Lee had been and was surreptitiously soliciting the Firm's clients on behalf of Dickinson Wright, without the Firm's knowledge, to leave the Firm and move their business to Dickinson Wright. Lee did so without informing the clients of their right to stay with the Firm or choose a different law firm.

53. For example, on January 15, 2025, while still employed as an equity partner at the Firm and 10 days before he gave notice of his intent to leave the Firm, Lee had a client sign a second engagement letter on the Firm's letterhead identifying himself as the firm under the defined term "NSL." He did so without informing anyone at the Firm.

54. The only difference between the new engagement letter and the old one, which the client had just recently signed less than a month before on December 20, 2024, is the change of the defined term from the Firm's old initials "BDL" to the initials for Lee's full name, "NSL." Lee changed the defined term to create proof that the client had engaged him personally as opposed to

11

the Firm. This client left the Firm for Dickinson Wright. Shortly after the client left the Firm, Dickinson Wright filed a contingent-fee lawsuit on behalf of this client.

55. At the time Lee had the client sign the second engagement letter using Lee's initials, NSL, in place of the Firm's initials, BDL, Lee had already completed Dickinson Wright's "Lateral Hiring Questionnaire" and knew he would be moving to Dickinson Wright

56. On January 24, 2025, and while still employed as an equity partner at the Firm and before notifying the Firm of his intent to leave, Lee sent an email to NW, soliciting the client to move with Lee to Dickinson Wright. In attempting to persuade NW to leave for Dickinson Wright, Lee misrepresented to NW that "all of my clients have chosen to transition with me," which was a falsehood designed to convince NW to follow Lee. He also tried to upsell NW on the benefits of going to Dickinson Wright as opposed to staying with the Firm. Lee sent these emails without copying or otherwise notifying anyone at the Firm of the communications and without informing the client of its right to choose to remain with the Firm, follow Lee or hire a new attorney.

57. On January 25, 2025, and while still employed as an equity partner at the Firm, Lee exchanged emails with a client, referred to herein as WM, soliciting the client to move with Lee to Dickinson Wright. In his attempt to persuade WM, Lee again misrepresented that "all of my clients have chosen to transition with me." When this client raised concerns about existing patent work, Lee tried to upsell WM on the benefits of going to Dickinson Wright as opposed to staying with the Firm. Lee sent these emails without copying or otherwise notifying anyone at the Firm of the communications and without informing the client of its right to choose to remain with the Firm, follow Lee or hire a new attorney.

58. On January 27, 2025, and while still employed as an equity partner with the Firm, Lee drafted an email to a client, referred to herein as AL, directing the client to use specific

12

language in a communication with the Firm's managing partner, Edward Bishop, to have the client's files transferred to Lee. He did so without copying or otherwise notifying anyone at the Firm of the communications. On information and belief, Lee sent this email to AL and then deleted this email after he sent it.

59. AL subsequently sent an email to Ed Bishop with substantially the same language suggested by Lee, directing the Firm to transfer his files to Lee's new firm.

60. Although Lee had refused to disclose the name of his new law firm to his partners when he announced to the Firm that he was leaving, Lee freely told the Firm's clients that he was moving to Dickinson Wright when he solicited them to move to Dickinson Wright.

61. The Firm became aware of Lee's misconduct on the afternoon of January 27, 2025, and promptly terminated him as an equity partner and employee for cause.

62. Under Illinois law, when an attorney changes law firms, the client is to be notified that it has the right to remain with the Firm, follow the departing attorney or hire a new law firm.

63. The ARDC even publishes a well-known guide setting forth the ethical obligations and requirements for lawyers who change law firms, which can be found at: www.iardc.org/Files/Leaving_a_Law_Firm.pdf. These rules are so well known, in fact, that law firms routinely advise lateral attorneys to review the ARDC's guide and the *Dowd & Dowd* cases before notifying clients of a plan to change law firms.

64. Attorneys in Illinois, including Lee and Dickinson Wright, are presumed to know and understand their obligations under the Illinois Rules of Professional Conduct and applicable case law.

65. Lee ignored his obligations and instead, secretly solicited Firm clients to leave with him for Dickinson Wright. Lee did so on behalf of, and with the knowledge of, Dickinson Wright.

In his email communications with Firm clients before he was terminated, Lee disclosed that he had already joined Dickinson Wright and promoted the benefits of moving to Dickinson Wright.

66. On information and belief, Lee provided a copy of the Stockholder Agreement to Dickinson Wright while he was being recruited and/or interviewed by Dickinson Wright.

67. Even if Dickinson Wright had not seen the actual Stockholder Agreement, Dickinson Wright knew that Lee was an equity partner with the Firm and therefore that Lee necessarily had a contractual obligation to the Firm, including but not limited to the obligation to conduct all his activities in connection with the practice of law for the benefit of the Firm and devote substantially all of his business time and activities to practicing law for the benefit of the Firm.

68. Dickinson Wright also knew that Lee had fiduciary obligations to the Firm, including but not limited to a duty of care and a duty of loyalty.

69. Dickinson Wright offered Lee a job as partner and employee on the condition that Lee bring certain clients from Bishop Diehl capable of generating over $1 million in revenue. At all relevant times, Dickinson Wright knew Lee would necessarily have to solicit Bishop Diehl's clients to meet this condition of joining Dickinson Wright.

70. After Lee's termination from the Firm, it discovered a blank questionnaire stored on Lee's Firm-owned computer from Dickinson Wright. The questionnaire required Lee to identify specific clients he would bring with him and corresponding amounts of past and projected revenue. On information and belief, Lee completed this questionnaire as part of the recruitment process with Dickinson Wright and represented to Dickinson Wright that he would bring clients from Bishop Diehl valued at $2 million to $3 million per year in revenue.

71.     Dickinson Wright knew that Lee had accepted its offer to join based on Lee's promise to bring the Bishop Diehl's clients with him to Dickinson Wright, and that Lee was hired on the condition that he bring these clients from Bishop Diehl.

72.     Dickinson Wright also knew that for Lee to honor his promise and meet the conditions of his employment with Dickinson Wright, he would have to solicit and recruit clients to move their business from Bishop Diehl to Dickinson Wright.

73.     On information and belief, Dickinson Wright knew that Lee gave Bishop Diehl only seven-day's notice that he would be leaving the Firm and failed to disclose to Bishop Diehl that he was moving to Dickinson Wright.

74.     Though the ostensible purpose of the seven-day notice period was for Lee to prepare for his exit from Bishop Diehl, the real purpose was for Lee to surreptitiously solicit and recruit Bishop Diehl's clients to move their business to Dickinson Wright.  By soliciting Bishop Diehl's clients while he was still an equity partner and employee of Bishop Diehl, Lee implied to clients that Bishop Diehl was aware of and approved of Lee's solicitations, without informing these clients of their choice to stay with Bishop Diehl or go with a different law firm.

75.     On information and belief, Dickinson Wright knew that Lee would use the seven-day notice period with Bishop Diehl to surreptitiously solicit and recruit clients to move their business from Bishop Diehl to Dickinson Wright.

### Suzie's Conduct In Assisting Nicholas Lee and HR

76.     Beginning in or around August of 2023, Suzie assumed primary responsibility for the Firm's bookkeeping and accounting functions and reported directly to the Firm's president, Edward Bishop.

77. In that role, Suzie was responsible for the timely preparation and issuance of monthly invoices reflecting all billable time and expenses incurred by the Firm for its clients.

78. Contrary to the Firm's standard billing practices, throughout 2024, Suzie knowingly failed to generate invoices for certain entities referred to Lee by HR, despite non-contingent legal work being performed for those entities by Firm personnel.

79. Suzie did not disclose to Edward Bishop or the Firm that such invoices were not being created, nor did she disclose that billable time and expenses were being incurred without corresponding billing.

80. Instead of properly billing expenses incurred in these matters, Suzie either failed to invoice the expenses or would improperly allocate them to the Firm's general overhead, thereby concealing their existence.

81. Throughout 2024, Suzie failed to generate invoices for more than $55,650.00 in billable fees and expenses that were incurred by the Firm in connection with patent, trademark, and other non-contingent matters on behalf of entities referred to Lee by HR.

82. By suppressing the creation of invoices, Suzie ensured that these amounts did not appear on the Firm's accounts receivable.

83. Suzie did these things to conceal her husband's misconduct from the Firm's management. This allowed Lee to work out a separate arrangement with certain clients for payment directly into his personal bank account and to send invoices on Firm letterhead directing certain clients to wire legal fees directly into his personal bank account, without the Firm knowing.

84. Suzie knowingly facilitated Lee's misconduct and personally benefited from it. In fact, from time to time, Lee transferred sums of money to Suzie from the same personal bank account he used to surreptitiously collect legal fees.

16

85.     In addition to being the Firm's bookkeeper and accountant, Suzie received a copy of the Firm's Stockholder Agreement, and knew that all income, fees and compensation for legal work performed by her husband and others at the Firm had to be paid to the Firm.

**COUNT I**
**FALSE DESIGNATION OF ORIGIN UNDER THE LANHAM ACT (15 U.S.C. § 1125(a))**
**(Against Defendants Nicholas Lee and Zhang Heng a/k/a Henry Rich)**

86.     For paragraph 86, the Firm adopts and re-alleges paragraphs 1 through 85 as though fully set forth herein.

87.     Defendants Lee and HR used Bishop Diehl's then-current name, branding, address, and letterhead (over which the Firm had, and still has, protectable rights) without the Firm's knowledge in interstate commerce in a manner likely to cause confusion or mistake as to the origin, sponsorship, or approval of legal services and related communications.

88.     At all relevant times, Lee was an equity partner at the Firm, contractually obligated to conduct all legal activity on behalf of the Firm and to direct all fees to the Firm.  HR was not affiliated with the Firm in any capacity and had no authority to use its identity, branding, or reputation.

89.     Together, Lee and HR created and distributed patent non-infringement opinion letters purporting to come from the Firm. These opinions prominently featured the Firm's name, office address, and Lee's name and professional title, falsely suggesting that they were official Firm work product.

90.     Lee and HR engaged in this conduct even after Lee expressly acknowledged to HR that the Firm "wouldn't allow this" and that the activity was being undertaken on a "personal basis," with payments to be directed to Lee's personal account.  Despite knowing that the Firm

17

would not approve, Lee and HR proceeded to distribute legal opinions bearing the Firm's identity in commerce.

91. These legal opinions were transmitted to Amazon and other third parties in commerce, despite being prepared and submitted without the Firm's knowledge, authorization, or review.

92. In furtherance of their joint scheme, Lee fabricated at least one invoice on Firm letterhead and provided it to HR, who then submitted it to a client to induce a $10,000 payment directly into Lee's personal bank account. The invoice was not created through the Firm's billing system and was designed to deceive the client into believing the payment was for authorized Firm services.

93. On at least one other occasion, HR misrepresented himself in a legal communication as "Weisite Law: Henry" using Bishop & Diehl's address – 1475 E. Woodfield Road, Suite 800, Schaumburg, Illinois – as his own, falsely suggesting to opposing counsel and Amazon that he was associated with the Firm. Defendants' unauthorized use of the Firm's name, identity, and professional branding constitutes a false designation of origin and a false or misleading representation of fact in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

94. The conduct of Lee and HR was willful and undertaken jointly with the intent to benefit commercially from the Firm's reputation, to deceive clients and third parties, and to misappropriate revenue and goodwill for their personal gain.

95. As a direct and proximate result of Defendants' actions, the Firm has suffered and continues to suffer harm, including reputational damage, client confusion, the diversion of legal business, and loss of income.

96. Defendants Lee and HR are jointly and severally liable for these violations.

97. Pursuant to 15 U.S.C. §§ 1116 and 1117, the Firm is entitled to injunctive relief, compensatory damages, disgorgement of profits, treble damages, and attorneys' fees.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendants, NICHOLAS LEE and ZHANG HENG a/k/a HENRY RICH, and award Plaintiff preliminary and permanent injunctive relief under 15 U.S.C. § 1116; compensatory damages in an amount to be proven at trial, disgorgement of all profits obtained through unlawful use of the Firm's name, treble damages and reasonable attorneys' fees under 15 U.S.C. § 1117, and any further relief the Court deems just and proper.

## COUNT II
## BREACH OF THE STOCKHOLDER AGREEMENT
### (Against Defendant Nicholas Lee)

98. For paragraph 98, the Firm adopts and re-alleges paragraphs 1 through 97 as though fully set forth herein.

99. At all relevant times, the Stockholder Agreement was a valid and enforceable contract, in which there was an offer by the Firm, acceptance by Lee and the exchange of adequate consideration. As an equity partner of the Firm, Lee was therefore obligated to abide by the terms of the Stockholder Agreement.

100. At all relevant times, the Firm fully performed its obligations under the Stockholder Agreement.

101. Article IV.A through IV.D of the Stockholder Agreement provides that:

   a. "All of [Lee's] activities in connection with the Practice of Law . . . shall be for the benefit of the Firm." (Ex. A, p. 5, Art. IV.A);
   b. "Substantially all of [Lee's] business time and activities shall be in the Practice of Law for the benefit of the Firm." (Ex. A, p. 6, Art. IV.B);
   c. "[Lee] will use his/her best efforts for the benefit of the Firm and Firm clients." (Ex. A, p. 6, Art. IV.C);

d.    All income, fees and compensation received from clients shall be paid to the Firm." (Ex. A, p. 6, Art. IV.D).

102.    Lee materially breached Article IV.A, B, C and D of the Stockholder Agreement by directing clients to make payments directly into Lee's personal bank account for legal work performed by Lee and other employees of the Firm while Lee was an equity partner and employee of the Firm.  Pursuant to Article IV.D, those monies are the property of the Firm and should have been paid to the Firm.

103.    Lee materially breached Article IV.A of the Stockholder Agreement by performing legal work for clients on behalf of and for the benefit of himself, instead of the Firm, and without the Firm's knowledge.

104.    Lee materially breached Article IV.A, B, C and D of the Stockholder Agreement by secretly directing clients to make payments to Lee directly, instead of the Firm, for legal work performed by Lee and others while Lee was an equity partner and employee of the Firm.

105.    Lee materially breached Article IV.A, B, C and D of the Stockholder Agreement by concealing from the Firm that he was performing legal work for the Firm's clients, for which he was being paid directly by the Firm's clients into his own personal bank account.

106.    Lee materially breached Article IV.A by soliciting the Firm's clients to leave the Firm for Dickinson Wright, for the benefit of Lee and Dickinson Wright, while Lee was still an equity partner and employee of the Firm.  More specifically, Lee's solicitation of the Firm's clients to move their business to Dickinson Wright violated the requirement in Article IV.A of the Stockholder Agreement that all of Lee's activities "in connection with the Practice of Law . . . shall be for the benefit of the Firm."  (Ex. A, p. 5, Art. IV.A).

107.    Lee materially breached Article IV.A of the Stockholder Agreement by concealing from the Firm that he was soliciting the Firm's clients to move their business to Dickinson Wright.

20

108. As a direct and proximate result of the foregoing misconduct, the Firm was damaged in the amount of at least $1.4 million.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, NICHOLAS LEE, and for an award of compensatory damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT III**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**(Against Defendant Nicholas Lee)**

109. For paragraph 109, the Firm adopts and re-alleges paragraphs 1 through 108 as though fully set forth herein.

110. At all relevant times, Lee was a partner of the Firm and, pursuant to the Stockholder Agreement, held a 20% equity ownership interest in the Firm. Lee also participated in the management of the Firm.

111. At all relevant times, Lee owed a fiduciary duty to the Firm while he was an equity partner and employee of the Firm, including a duty of care and a duty of loyalty.

112. Pursuant to the fiduciary duties Lee owed to the Firm, Lee was required to put the interest of the Firm first, ahead of his own personal interests.

113. The fiduciary duties Lee owed to the Firm prohibited him from instructing clients to make payments directly to him for legal services he provided, accepting payment from the Firm's clients for legal work he provided, usurping work opportunities from the Firm, and soliciting the Firm's clients to move their business to Dickinson Wright.

114. Lee was also prohibited from disclosing the Firm's confidential information to third parties.

115.     Under Illinois law, lawyers who are planning to leave a law firm may not solicit clients for their new venture.  Until terminated, the client relationship created by a contract terminable at will is subsisting and will presumptively continue in effect so long as the parties are satisfied.

116.     While an equity partner and employee of the Firm, Lee breached his fiduciary duties to the Firm in one or more of the following ways:

  a.     By performing legal work for the Firm's clients for the benefit of himself, without notifying or otherwise alerting the Firm;

  b.     By secretly instructing clients of the Firm to make payments for legal services performed by Lee or others at the Firm directly into Lee's personal bank account;

  c.     By accepting payments of approximately $400,000 from the Firm's clients for legal work Lee performed while he was an equity partner and employee of the Firm;

  d.     By usurping the Firm's business opportunities to perform the legal work for its clients, for which Lee received compensation directly into his personal bank account;

  e.     By concealing from the Firm that he had been performing legal work for the Firm's clients and receiving payments for this work directly from the clients into his own personal bank account;

  f.     By accepting compensation from the Firm, including bonuses, without disclosing to the Firm that he had also been receiving compensation directly from the Firm's clients for legal work he had performed as an attorney and equity partner of the Firm;

  g.     By creating a fake invoice, directing Firm client to wire a $10,000 payment directly into Lee's personal bank account for legal work performed by Lee and others at the Firm;

  h.     By lying to his partners at the Firm about his plans to leave the Firm and his intention to use the seven-day notice he gave the Firm as an opportunity to secretly solicit the Firm's clients;

  i.     By concealing the identity of his new law firm, Dickinson Wright;

22

j. By disclosing the Firm's confidential information to Dickinson Wright;

k. By secretly soliciting the Firm's clients to leave the Firm and move their business to Dickinson Wright, while he was still an equity partner and employee of the Firm;

l. By falsely stating to the Firm's clients that "all of my clients have decided to transition with me" to Dickinson Wright in an effort to convince the clients to move their business to Dickinson Wright;

m. By lying to the Firm's clients about their rights to stay with the Firm, move with Lee to Dickinson Wright or find a new law firm;

n. By trying to upsell the Firm's clients on the benefits and superior resources of Dickinson Wright in an effort to convince the clients to leave the Firm and move their business to Dickinson Wright;

o. By acting for the benefit of and as the agent of Dickinson Wright while he was still an equity partner and employee of the Firm

p. By refusing to return a vehicle leased by the Firm for Lee's use, take over the lease from the Firm or otherwise arrange for the Firm to be released from the lease obligations; and,

q. By instructing or causing his wife, Suzie, who was employed by the Firm as its in-house accountant, to suppress or omit billing entries from the Firm's financial records to conceal his diversion of client funds, thereby undermining the Firm's internal controls and further concealing the fraud.

117. Though the ostensible purpose of the seven-day notice period was for Lee to prepare for his exit from Bishop Diehl, the real purpose was for Lee to surreptitiously solicit and recruit Bishop Diehl's clients to move their business to Dickinson Wright. By soliciting Bishop Diehl's clients while he was still an equity partner and employee of Bishop Diehl, Lee implied to the clients that Bishop Diehl was aware and approved of Lee's solicitations, without informing these clients of their choice to stay with Bishop Diehl or go with a different law firm.

118. As a direct and proximate result of the foregoing misconduct, the Firm suffered damages in excess of $1.4 million.

23

119. In addition, under Illinois law Lee must forfeit the compensation he collected from the Firm, including bonuses, during the time he was breaching his fiduciary duties to the Firm. Between 2020 and 2025, Lee received compensation from the Firm of about $1.6 million. Accordingly, Lee must forfeit and repay the Firm $1.6 million.

120. The Firm is also entitled to punitive damages for Nicholas Lee's intentional and malicious misconduct.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, NICHOLAS LEE, and for an award of compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT IV**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Defendant Zhang Heng a/k/a Henry Rich)**

121. For paragraph 121, the Firm adopts and re-alleges paragraphs 1 through 120 as though fully set forth herein.

122. At all relevant times until his termination, Lee owed fiduciary duties to the Firm as an equity partner, including duties of loyalty, care, and full disclosure.

123. Defendant HR, who holds himself out as an attorney, knew or should have known that Lee owed fiduciary obligations to the Firm, particularly after being informed by Lee that "the Firm wouldn't allow this" and that Lee was acting in a personal capacity.

124. Despite this knowledge, HR substantially assisted Lee in violating his fiduciary duties, including in one or more of the following ways:

  a. Requested and forwarded a fabricated invoice printed on the Firm's letterhead, for the purpose of convincing a Firm client to make a $10,000 payment directly into Lee's personal bank account;

b.     Conspired with Lee to have Lee perform discounted legal work for HR's clients, despite knowing the work was not authorized by the Firm;

c.     Conspired with Lee to have payments for legal work performed by Lee and others at the Firm made directly into Nicholas Lee's personal bank account instead of the Firm's bank account;

d.     Conspired with Lee to conceal from the Firm the fact that Lee was performing legal work for clients referred by HR, without the Firm's authorization.

e.     Conspired with Lee to conceal from the Firm the fact that Lee was receiving payments for legal work he and others at the Firm performed for clients referred by HR;

f.     Caused clients to make payments for legal work performed by Lee and others at the Firm directly into Lee's personal bank account instead of the Firm's bank account;

g.     Knowingly made payments directly into Lee's personal bank account for legal work Lee and others at the Firm provided to HR or HR's clients;

h.     Distributing legal opinion letters prepared by Lee and falsely attributed to the Firm, despite knowing that the Firm did not authorize the work or opinion letters; and

i.     Assisted Lee with concealing from the Firm the transactions in which HR or clients referred by him made payments into Lee's personal bank account.

125.    As a direct and proximate result of HR's unlawful conduct in aiding and abetting Lee's breaches of fiduciary duties, the Firm suffered injuries, including but not limited to, lost revenue, reputational damage, and disruption to client relationships.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, ZHANG HENG a/k/a HENRY RICH, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

25

**COUNT V**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC BENEFIT**
**(Against Defendant Nicholas Lee)**

126. For paragraph 126 the Firm adopts and re-alleges paragraphs 1 through 125 as though fully set forth herein.

127. At all relevant times, the Firm had a valid business relationship with its clients, including but not limited to NW, WM and AL, which the Firm expected to continue into the foreseeable future.

128. At all relevant times, Lee was aware of the valid business relationship the Firm had with its clients, including NW, WM and AL, and knew this valid business relationship was expected to continue into the foreseeable future.

129. While Lee was still an equity partner and employee of the Firm, he purposely interfered with the Firm's valid business relationship with its clients by secretly soliciting the Firm's clients to leave the Firm and move to Dickinson Wright. As a result, certain clients left for Dickinson Wright and the Firm's business relationship with these clients was terminated.

130. Until terminated, the valid business relationship created by a contract terminable at will is subsisting and will presumptively continue in effect so long as the parties are satisfied. Prior to Lee's wrongful and malicious interference with these relationships, the Firm's clients were satisfied with the Firm.

131. As a direct and proximate result of the foregoing misconduct, the Firm was damaged in excess of $1 million.

132. The Firm is also entitled to punitive damages for Lee's intentional and malicious misconduct.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, NICHOLAS LEE, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT VI**
**CONVERSION**
**(Against Defendant Nicholas Lee)**

133.    For paragraph 133, the Firm adopts and re-alleges paragraphs 1 through 132 as though fully set forth herein.

134.    Between 2020 and the date of his termination in January 2025, Lee directed certain of the Firm's clients to make payments for legal services directly into his personal bank account. In all, Lee deprived the Firm of at least $390,000 in payments that should have gone to the Firm.

135.    Pursuant to Article IV of the Stockholder Agreement, the Firm was entitled to, and has a right to, the money Lee received directly from the Firm's clients for legal work performed by Lee.

136.    The Firm has an absolute and unconditional right to immediate possession of the payments Lee collected from the Firm's clients.

137.    On or about February 27, 2025, the Firm, through its counsel, demanded from Lee that he repay the Firm the full amount of fees he collected from the Firm's clients.  To date, Lee has refused to tender this money to the Firm, depriving the Firm of its property.

138.    Lee has wrongfully and without authorization assumed control, dominion and ownership over the money he collected from the Firm's clients, which belongs to the Firm and should have been paid to the Firm.

139. As a direct and proximate result of the foregoing misconduct, the Firm suffered damages in the amount of at least $390,000, plus interest.

140. The Firm is also entitled to punitive damages for Lee's intentional and malicious misconduct.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, NICHOLAS LEE, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT VII**
**CONSTRUCTIVE FRAUD**
**(Against Defendant Nicholas Lee)**

141. For paragraph 141, the Firm adopts and re-alleges paragraphs 1 through 140 as though fully set forth herein.

142. As set forth above, as an equity partner and employee of the Firm, Lee owed a fiduciary relationship to the Firm, including a duty of care and a duty of loyalty. Lee also participated in the management of the Firm.

143. The Firm trusted and depended on Lee to abide by his fiduciary duties and conduct himself in a manner for the benefit of the Firm. The Firm gave Lee the discretion to communicate directly with clients, set rates and ensure fees owed to the Firm were collected.

144. The fiduciary duties Lee owed to the Firm were imposed by law as a result of Lee's status as an equity partner and employee of the Firm.

145. While an equity partner and employee of the Firm, Lee breached his fiduciary duties to the Firm in one or more of the following ways:

    a. By performing legal work for the Firm's clients for the benefit of himself, without notifying or otherwise alerting the Firm;

28

b.  By secretly instructing clients of the Firm to make payments for legal services performed by Lee and others at the Firm directly into Nicholas Lee's personal bank account;

c.  By accepting payments of at least $390,000 from the Firm's clients for legal work Lee and others at the Firm performed while he was an equity partner and employee of the Firm;

d.  By usurping the Firm's business opportunities to perform the legal work for its clients, for which Lee received compensation directly into his personal bank account;

e.  By concealing from the Firm that he had been performing legal work for the Firm's clients and receiving payments for this work directly from the clients into his own personal bank account;

f.  By accepting compensation from the Firm, including bonuses, without disclosing to the Firm that he had also been receiving compensation directly from the Firm's clients for legal work he had performed as an attorney and equity partner of the Firm;

g.  By creating a fake invoice, directing Firm client to wire a $10,000 payment directly into Nicholas Lee's personal bank account for legal work performed by Lee and others at the Firm;

h.  By lying to his partners at the Firm about his plans to leave the Firm and his intention to use the seven-day notice he gave the Firm as an opportunity to secretly solicit the Firm's clients;

i.  By concealing the identity of his new law firm, Dickinson Wright;

j.  By disclosing the Firm's confidential information to Dickinson Wright;

k.  By secretly soliciting the Firm's clients to leave the Firm and move their business to Dickinson Wright, while he was still an equity partner and employee of the Firm;

l.  By falsely stating to the Firm's clients that "all of my clients have decided to transition with me" to Dickinson Wright in an effort to convince the clients to move their business to Dickinson Wright;

m.  By lying to the Firm's clients about their rights to stay with the Firm, move with Lee to Dickinson Wright or find a new law firm;

29

n.   By trying to upsell the Firm's clients on the benefits and superior resources of Dickinson Wright in an effort to convince the clients to leave the Firm and move their business to Dickinson Wright;

o.   By acting for the benefit of and as an agent of Dickinson Wright while he was still an equity partner and employee of the Firm;

p.   By refusing to return the vehicle leased by the Firm for Nicholas Lee's use or take over the lease from the Firm or otherwise arrange for the Firm to be released from the lease obligations; and

q.   By instructing or causing his wife, Suzie, who was employed by the Firm as its in-house accountant, to suppress or omit billing entries from the Firm's financial records to conceal his diversion of client funds, thereby undermining the Firm's internal controls and further concealing the fraud.

146. Lee engaged in the foregoing misconduct without the Firm's knowledge, and in fact, attempted to conceal his misconduct from the Firm.

147. As a direct and proximate result of the foregoing misconduct, the Firm suffered damages in excess of $1.4 million.

148. In addition, Lee must forfeit the compensation he collected from the Firm, including bonuses, during the time he was breaching his fiduciary duties to the Firm. Between 2020 and 2025, Lee received compensation from the Firm of about $1.6 million. Accordingly, Lee must forfeit and repay the Firm $1.6 million he received in compensation.

149. The Firm is also entitled to punitive damages for Lee's intentional and malicious misconduct.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, NICHOLAS LEE, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

## COUNT VIII
## UNJUST ENRICHMENT
**(Against Defendant Nicholas Lee and Suzie Lee)**

150. For paragraph 150, the Firm adopts and re-alleges paragraphs 1 through 151 as though fully set forth herein.

151. Lee unjustly retained a benefit to the Firm's detriment when he sought and accepted nearly $400,000 in payments for legal services from NW and HR.

152. Lee's retention of this benefit violates fundamental principles of justice, equity, and good conscience.

153. Lee's tortious and unlawful behavior gives rise to the claim for unjust enrichment.

154. Lee obtained the benefit from a third party, the Firm's clients, through wrongful conduct.

155. Suzie knowingly participated in and facilitated the diversion of these funds by, among other things, failing to generate invoices, concealing accounts receivable, and maintaining accounting records in a manner that obscured the Firm's entitlement to payment.

156. As a result of the foregoing conduct, Suzie directly and/or indirectly received and retained benefits derived from the diverted funds, including financial benefits obtained through her household and marital relationship with Nicholas Lee.

157. The Firm had a better claim to the benefit than Lee and Suzie, and indeed, the only right to the benefit.

158. The Firm is also entitled to punitive damages for Lee's and Suzie's intentional and malicious misconduct.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, NICHOLAS LEE and SUZIE LEE, and award

31

Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c) and § 1964(c)**
**(Against Defendants Nicholas Lee, Suzie Lee, and Zhang Heng a/k/a Henry Rich)**

159. For paragraph 159, the Firm adopts and re-alleges paragraphs 1 through 158 as though fully set forth herein.

160. This Count is brought pursuant to 18 U.S.C. § 1964(c) for violations of 18 U.S.C. § 1962(c) against Defendants Lee, Suzie, and HR.

161. At all relevant times, Defendants Lee, Suzie, and HR were associated in fact and operated as an enterprise within the meaning of 18 U.S.C. § 1961(4). This "Lee-HR Enterprise" engaged in a pattern of racketeering activity with the shared purpose of misappropriating the Firm's clients, revenues, and intellectual property for their own personal financial gain.

162. The enterprise was not limited to their personal identities but included the systematic misuse of the Firm's name, address, email infrastructure, letterhead, signature blocks, legal opinions, client relationships, and access to the Firm's computers, files and records.

163. Between at least November of 2023 and January of 2025, Defendants Lee, Suzie, and/or HR engaged in a pattern of racketeering activity involving repeated and related acts of wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and access device fraud, including but not limited to the following predicate acts:

    a.     Lee transmitted a fraudulent invoice via email on Firm letterhead to HR, without the Firm's authorization, directing the recipient of the invoice to make a payment to his personal bank account, in violation of 18 U.S.C §§ 1341, 1343;

    b.     HR sent the fraudulent invoice referred to above to a Firm Client, directing the Firm client to make a payment for legal services into Lee's personal

32

bank account, without the Firm's authorization, in violation of 18 U.C.S §§ 1341 and 1343;

c.  Lee transmitted emails to HR and Firm clients, including NW, using his Firm email address, without the Firm's authorization, directing HR and Firm clients to wire funds belonging to the Firm into Lee's personal bank account, in violation of 18 U.S.C §§ 1341 and 1343;

d.  Lee misappropriated funds belonging to the Firm when he accepted wire transfer deposits from Firm clients into his personal bank account that should have been paid to the Firm, in violation of18 U.S.C §§ 1341 and 1343;

e.  HR conspired with Lee via email communications (using Lee's Firm email address) and telephone calls to have Firm clients referred to the Firm by HR make payments that should have gone to the Firm, directly into Lee's personal bank account, without the Firm's authorization, in violation of 18 U.S.C §§ 1341 and 1343.

f.  HR and Lee exchanged email communications (using Lee's Firm email address) and telephone calls discussing the plans for Lee to perform legal services for HR's clients at a discounted rate and for payments to be made directly into Lee's personal bank account, in violation of 18 U.S.C §§ 1341 and 1343;

g.  Lee used the Firm's laptop computer and network server, without the Firm's authorization, to send emails with the intent to defraud the Firm, directing HR and Firm clients to make payments for legal work performed by Lee into Lee's personal bank account, in violation of 18 U.S.C. §§ 1029(a)(2) and (5) and 18 U.S.C 1030(4);

h.  Suzie failed to generate invoices for certain entities referred to Lee by HR for legal services performed in 2024 and failed to properly record billable expenses for certain entities referred to Lee by HR for legal services performed in 2024 to help conceal Lee's misconduct;

i.  Suzie knowingly facilitated and participated in this arrangement and personally benefited from this scheme through payments she received from her husband's same personal bank account.

164.  The foregoing predicate acts were related, continuous, and committed to defraud the Firm and wrongfully misappropriate its revenue, business opportunities and goodwill.

33

165. The racketeering activities affected interstate commerce by interfering with the lawful billing, handling, and transmission of legal services across state and international lines, and by exploiting domestic access to U.S.-based platforms such as Amazon.

166. Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

167. As a direct and proximate result of Defendants' RICO violations, the Firm has suffered significant injury to its business and property, including but not limited to the diversion of hundreds of thousands of dollars in revenue, the loss of clients, damage to reputation, expenses incurred in remediating fraudulent activity, and interference with its ongoing operations.

168. Pursuant to 18 U.S.C. § 1964(c), the Firm is entitled to recover treble damages, the cost of suit, and reasonable attorneys' fees.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD. respectfully requests that this Court enter judgment in its favor and against Defendants NICHOLAS LEE, SUZIE LEE, and ZHANG HENG a/k/a HENRY RICH, and award Plaintiff treble damages as authorized by 18 U.S.C. § 1964(c), reasonable attorneys' fees and the costs of this action, equitable relief, including injunctive relief to prevent further racketeering activity, and any further relief as the Court deems just and proper.

**COUNT X**
**CIVIL CONSPIRACY**
**(Against Defendants Nicholas Lee, Suzie Lee, and Zhang Heng a/k/a Henry)**

169. For paragraph 169, the Firm adopts and re-alleges paragraphs 1 through 168 as though fully set forth herein.

34

170.    Between 2023 and January 2025, Defendants, acting in concert with each other and other unknown co-conspirators, conspired by concerted actions to accomplish an unlawful purpose by unlawful means, namely, the diversion of Firm revenue, resources, and client goodwill to themselves personally and to third parties.

171.    In furtherance of the conspiracy, Defendants committed the overt acts described throughout this Complaint and were otherwise willful participants in joint activity.

172.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness and a reckless indifference to both Lee's and Suzie's obligations and the Firm's rights.

173.    As a direct and proximate result of the conspiracy, the Firm has suffered substantial damages, including misappropriation of its revenue, reputational harm, and lost business opportunities.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendants, NICHOLAS LEE, SUZIE LEE and ZHANG HENG a/k/a HENRY RICH, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT XI**
**UNJUST ENRICHMENT**
**(Against Defendant Zhang Heng a/k/a Henry Rich)**

174.    For paragraph 174, the Firm adopts and re-alleges paragraphs 1 through 173 as though fully set forth herein.

175.    Defendant HR received substantial payments and other benefits derived from legal work performed by the Firm, its attorneys, and its staff, including:

a.      Legal services performed by Nicholas Lee while employed by the Firm;

35

b.      Services rendered using Firm resources or under the Firm's name; and

c.      Work product submitted to Amazon and others that was falsely attributed to the Firm.

176.   HR was unjustly enriched by receiving the benefit of these services without compensating the Firm and by knowingly participating in a scheme to divert payments to Lee's personal account.

177.   Equity and good conscience require restitution. HR should not be permitted to retain the benefits obtained through this deceptive and unauthorized conduct.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, ZHANG HENG a/k/a HENRY RICH, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT XII**
**FRADULENT CONCEALMENT**
**(Against Defendant Suzie Lee)**

178.   For paragraph 178, the Firm adopts and re-alleges paragraphs 1 through 177 as though fully set forth herein.

179.   At all relevant times, Defendant Suzie, served as the Firm's bookkeeper and accountant and was responsible for, among other things, preparing and issuing client invoices, maintaining the Firm's accounts receivable, and accurately reporting the Firm's financial condition to management, including Edward Bishop.

180.   As part of her job duties, Suzie was required to accurately account for and disclose to Firm management material financial information, including the existence of billable time, expenses, and receivables arising from legal services performed by the Firm.  In other words, Suzie

owed the Firm a duty to disclose complete and accurate financial information regarding the Firm, including its billable time and expenses and accounts receivable.

181. Suzie was aware of the Firm's Stockholders Agreement and the requirement that all client fees and revenues generated by Firm personnel be paid to the Firm.

182. Beginning no later than 2023 and continuing thereafter, Suzie knowingly and intentionally concealed material facts from the Firm by failing to document billable time and expenses incurred on behalf of clients referred by HR and by failing to issue invoices for such work and expenses. Instead of sending invoices for billable expenses, Suzie misallocated them to the Firm's general overhead accounts or did not invoice them at all.

183. At all relevant times, Suzie knew that the concealed information was material to the Firm's financial operations and that the Firm was entitled to the revenues being diverted.

184. Suzie intended that the Firm, including its president, rely on the completeness and accuracy of the Firm's accounting records and financial reporting.

185. The Firm did, in fact, reasonably rely on Suzie's accounting records and financial reporting, believing them to be complete and accurate, and was thereby prevented from discovering the diversion of its revenues.

186. As a direct and proximate result of Suzie's fraudulent concealment, the Firm suffered damages, including but not limited to lost legal fees, uncollected receivables, and other financial harm in an amount to be proven at trial.

187. As a result of her misconduct, Suzie must forfeit the compensation she collected from the Firm, including bonuses, during the time she was concealing financial information from the Firm.

188. Suzie's conduct was willful, intentional, and undertaken with the purpose of concealing the diversion of Firm revenues, thereby entitling the Firm to punitive damages.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, SUZIE LEE, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**COUNT XIII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**(Against Defendant Suzie Lee)**

189. For paragraph 189, the Firm adopts and re-alleges paragraphs 1 through 188 as though fully set forth herein.

190. Suzie had specific knowledge about the Confidential Stockholder Agreement and the contents of the Confidential Stockholder Agreement – including Nicholas Lee's obligations owed to the Firm. Accordingly, Suzie was aware of Lee's fiduciary duties owed to the Firm

191. Lee breached his fiduciary duties to the Firm by misappropriating client funds for his own personal benefit, falsifying invoices, converting Firm assets, and soliciting Firm clients before resigning.

192. Suzie knowingly assisted Lee in breaching his fiduciary duties by failing to generate invoices, concealing financial irregularities, and directly benefiting from the misappropriated assets and funds.

193. Suzie's actions substantially assisted Lee in carrying out his breaches.

194. As a direct and proximate result of Suzie's participation in Lee's misconduct, the Firm suffered financial damages and reputational harm in an amount to be determined at trial.

195.    As a result of her misconduct, Suzie must forfeit the compensation she collected from the Firm, including bonuses, during the time she was aiding and abetting Nicholas Lee in breaching his fiduciary duties to the Firm.

196.    Suzie's conduct was willful, knowing, and undertaken with conscious disregard for the Firm's rights, thereby entitling the Firm to punitive damages.

WHEREFORE, Plaintiff BISHOP & DIEHL, LTD, prays that this Honorable Court enter judgment in its favor and against Defendant, SUZIE LEE, and award Plaintiff compensatory damages and punitive damages in an amount to be proven at trial, plus interest and attorneys' fees, and any further relief this Court deems fair and just.

**JURY DEMANDED.**  Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
BISHOP & DIEHL, LTD


s/ Patrick R. Moran
     One of its attorneys


Patrick R. Moran, ARDC No. 6272747
Matthew D. Patterson, ARDC No. 6321918
ROCK FUSCO & CONNELLY LLC
333 W. Wacker Drive, 19th Floor
Chicago, IL 60606
(312) 494-1000 / (312) 494-1001 (f)
pmoran@rfclaw.com
mpatterson@rfclaw.com
*Attorneys for Plaintiff*

39